Higgins et al. v. Harrison et al. show the appearance of Philip Nathanson. Are you here, sir? I am, sir. For the appellant and for the appellee, James Jackson and Craig Runyon. Are you Mr. Runyon? Yes, sir. Okay. Will both of you be arguing? Okay. Then, Mr. Nathanson, you may proceed, sir. Thank you, Your Honor, and may it please the court. My name is Philip Nathanson. I represent the Harrison defendants, many of whom are in the courtroom this morning. As the court knows, this is an interlocutory appeal from an order appointing a receiver slash farm manager. I think it's important from the point of view of the appellants from my clients to start out with the proposition that my client, through a limited liability company, Harrison Farm Management, LLC, was managing this farm by the authority of his Mr. Lyle Harrison, through this LLC, was in possession of the farm, was planting the crop, did plant the crop, harvested the crop through his company. The circuit court judge below dispossessed him of his management, in effect de facto canceled his contract, and decided to put in the Hardware State Bank as the farm manager. This order that's on appeal to this court is the culmination of a proceeding where initially the circuit court judge asked the parties to suggest farm managers. Four or five or six suggestions were made by the parties from February of 2012 through the summer. The circuit court judge, Judge Flannel, didn't take any action on any of those suggestions. Then all of a sudden in September of 2012, the plaintiffs filed an emergency motion after this issue had been under consideration for months and months and months to appoint the Hardware State Bank as the farm manager, an entity that had never been suggested before, that was not in the cards in all the prior proceedings on the farm manager. And on one day's notice, with no showing that this bank could even manage the farm that was made in the courtroom, Judge Flannel appointed the Hardware State Bank to manage this farm that Mr. Harrison is sitting at the council table with me, had managed successfully, had doubled the profits on the farm. There was no waste, no fraud, actually just success. But the plaintiffs didn't want Mr. Harrison to manage the farm anymore. They were suing Mr. Harrison. So they wanted a bank to manage the farm. Judge Flannel stated on the record that he called over to the bank, the Hardware State Bank, the morning of the hearing on the receiver, because the motion that had been filed by the plaintiffs didn't make it clear whether the Hardware State Bank even did farm management. So in an ex parte conversation, he made a phone call over to the bank, never said who he called or with whom he was speaking, and examined them off the record as to whether they even did farm management. He had assured him that they did farm management. And keep in mind, your honors, my clients at the time were not represented by me or any lawyer. They were pro se. So you have a circuit court judge telling pro se litigants when they get to the hearing that day that he had called over to the bank and asked them if they even did what he was about to appoint them to do. So he appointed them as a farm manager. He also disclosed on the record that he was a shareholder in the Hardware State Bank, that he owned stock in the bank. So even though the plaintiffs suggested four or five other farm managers over a period of months, which he never appointed, he chose in an emergency hearing on one day's notice with no showing in a motion to appoint the Hardware State Bank as the farm manager and to dispossess my client who had doubled the No, your honor. I wouldn't be arguing. I would be here. So it's not that big a deal? Well, I think it's a big deal the manner in which it was done. I think it's a big deal when there's some deliberative process set up by a court that is short-circuited, that the judge for no reason, in terms of rejecting the others or accepting this one, appoints this bank to do what it did. Our position, as the court knows from the briefs, is that a receiver is an extraordinary remedy. It's not a garden-variety, gee whiz, it seems like a good idea, which is really all that Judge Flannel ever said about any of the receivers writ large. He said, well, we have one side of this family suing the other side of the family. I think it's a good idea if we have an independent person managing the farm. That's not the standard for appointing a receiver, respectfully. So had there been some showing that one of these other people was superior and that the elements of appointing a receiver, fraud, waste, mismanagement, etc., etc., was present in this case. Counsel, what about Judge Flannel's comments regarding the contract under which your client acted as the manager, that had this penalty, substantial penalty, that would have to be paid to him if the contract were terminated? Your Honor, I have several points to make on that. First, the contract was in the name of an LLC, Harrison Farm Management LLC, and it was with Mr. Roger Harrison Sr., who is now deceased. Harrison Farm Management LLC was never made a party to this case by the plaintiff. They never had accounts for cancellation of a contract or dispossession of that entity as the farm manager. The judge, when it was suggested to him that this contract had a liquidated damage clause or a severance clause, said that that was inappropriate. It is our position, he had no jurisdiction to deal with Harrison Farm Management as a matter of due process at all because they weren't a party. We've argued below, which is before the court at the moment, that they were a necessary party. For whatever reason, I don't know. The plaintiff has chosen not to join them as a party defendant to effect a cancellation or to litigate the meaning of that clause. So our position is that was a gratuitous comment. He made it clear he didn't like the severance clause, but there was nothing before the court for him to deal with the severance clause. Furthermore, Your Honor, but by the action he took, he triggered the severance clause if indeed he could effectively terminate a contract of a court. So if the severance clause, our position is this, Justice Holder White, our position is this. If the severance clause is a problem, then there's a way to litigate a severance clause in a contract and decide whether it's valid or invalid. If Lyle Harrison receives money he shouldn't receive, this is a multimillion dollar farming operation. There's a way in a decree to fashion a account for whatever financial inequities were believed to be improper. However, to use the remedy of a receiver is draconian beyond draconian. To actually dispossess Harrison Farm Management LLC, which wasn't before the court, and say you're out, I'm point of view, justified under these facts. I mean, this is a situation in this day and age where I'm happy to say that my client doubled the profit of the farm. How do we know? You keep saying that. How do we know? Isn't that what this litigation is all about, whether the books are cooked, whether these records are accurate, whether this information is correct? And isn't that one of the underlying themes behind Judge Flannell's actions here that he doesn't really know? I mean, after all, Roger Sr. talked about how expenses were paid here and there, including legal expenses. Why, given the litigation brought by other family members for an assessment of accounting and disposition of all this, why was it inappropriate for the judge to decide I want an independent third party who has no dog in this fight to be in charge of this farm and make sure that things are going to be handled appropriately? Well, of course the operative did this appropriately. You have someone... I'll go back to my first question. How do we know, other than accepting Roger Sr.'s word that everything is just fine, that anything is fine here? That the books weren't cooked? Justice Steigman, we know as follows. We know that several accountings were made by my client. They're in the appellate record. Canceled checks, credit card statements, deposits into farm accounts. The most that the plaintiffs have ever raised about that was that Roger Sr. used some of the money, $20,000, $30,000, to pay legal expenses in connection with this case. Well, I'm a skeptical guy. If I'm on the other side, I think, you know, that doesn't sound to me like pocket change. If we got $20,000 or $30,000 that we can point to as being maybe not handled properly, if we had an independent guy in there, what else might be discovered? Well, this goes to the crux, from my point of view, of the fallacy of what's going on in the circuit court in this case. The plaintiffs filed a partition suit and pleaded that they own one half of the farm and its proceeds, and that my client owns one half of the farm and the proceeds. My clients. My clients dispute that the plaintiffs have a 50% ownership. Any way you cut that, my clients own 50% of the farm. If the court ends up adjudicating this case, agreeing with the First Amendment complaint, my clients own 50% of the farm and 50% of the proceeds. Judge Flannel has viewed this, that my client cannot touch the proceeds, even though the plaintiffs concede that 50% of the proceeds belong to them. Counsel, that doesn't address the question at all about what is this block of bucks that is being chopped up and is it being accounted for correctly and accurately. The accounting has not been challenged in any form or fashion in the lower court. We had hearings where $335,000 that was deposited from the marketing of the 2012 crop was accounted for, and all the money was there except $6,000 to pay taxes to Moultrie County, Your Honor. This really isn't a matter of conjecture or pleading or contentions. The money, all that can be pointed to is that some of the money was used to defend the case, which is an interesting question. If my clients are disabled by all these orders, freeze orders, injunction orders, without findings, receiver orders, if my clients are frozen and locked up, then they've been sued in a partition case that can't defend themselves. I mean, since 50% of the money is conceded to be theirs, I don't understand how they can have the farm taken away from them, all the money frozen, and say, you're out. I don't understand it. I'm interested to hear what counsel has to say to justify it. May I reserve whatever time remaining for rebuttal? You're going to have five minutes in rebuttal, counsel, no matter what. So I don't enlarge that by reserving? No. Okay. I apologize. Okay. You have time still left to go. Okay. Well, I'm going to keep going then. Go ahead. Counsel argues that Judge Flannell's issue of stock is a de minimis issue in this case. I don't see it that way, in view of stock and the receiver. I mean, to appoint a bank as receiver, that you own stock in, as a judge. And to say on the record, you're not even sure if they do what they did, but I'm going to call over there, because you know the people, and see what they do. I mean, I know that stuff happened in Cook County three, four decades ago, but I can't believe it's going to be permitted to happen in a case like this. Counsel, what do you mean, what stuff? To what are you referring? Appointing receivers that are, with which the judge is involved on a financial basis. He said he was a shareholder in the bank. I don't think that should be done. Period. We've argued he should have recused himself. The rule says he has a mandatory duty to recuse himself, if he has a financial stake. If he has more than a de minimis financial stake. Frankly, Your Honor, I couldn't find anything on the difference between de minimis financial stake and financial stake. Let's focus on what the rule says. What does it actually say? The rule says the judge should recuse himself, or herself, sua sponte, if they have a financial stake in a party, or in the controversy, unless it's a de minimis stake. So, how many shares of the bank are there, Counsel? The judge didn't say. I'm not privy to that. Well, wouldn't it be a good idea to find that out, supplement the record, provide some information, ask for a petition for reconsideration before accusing the judge of being corrupt? Just as a matter of form, Counsel. Well, Justice Steinman, I haven't accused the judge of being corrupt.  I'm saying you should. You know, I've been around, this is my 37th year on the bench, Counsel. I understand the language in my mother's tongue. I also am originally from Cook County, and I was there holding court when Greywater was around. Now, I understand your reference to Cook County three decades ago. That's, this is to suggest that he's corrupt. If there were 10,000 shares of Banksock, and he owned five, would that be de minimis? I don't think a share is de minimis, but I recognize the rule. If you're asking me, I recognize the rule says if it's a de minimis stake. Well, what about my question? If there were 10,000 shares of Banksock, and he owned five, would his interest be de minimis? Not in the context of a receiver. Where the receiver is a peer. So, I'm not going to get an answer to my question? Your Honor, I don't think it's de minimis. I don't mean to avoid your question. This party is now in control of all the money at the farm. They are managing the farm to the exclusion of my clients. He has dispossessed my clients of their property. And he has a stake in the party that is going to get fees to manage the farm. I think in the context of this case, I can't believe there's a Hornbill definition of de minimis that applies across the board. In the context of this case, where the party, it's not just that you have a corporation. Well, you're arguing to us essentially it's not de minimis. Here's my point. He entered this order, what, back in September of 2012? He did. How hard would it have been to address this specific point? For a petition to reconsider to have been presented to the court saying, Judge, you just brought this up so we know what's happening. And here's an affidavit from the president of the hardware bank.  And there only are 100 outstanding shares of stock. So what that means is your five shares is 5%. That's not de minimis. You should retreat. How hard would that have been? Well, as opposed to just coming before us and speculating and smearing the trial judge. That would be the other option, I guess. Well, every time my clients served a deposition subpoena, they were sanctioned for seeking discovery. I'm talking about the issue is, is this de minimis? That's the question. We would know that by getting an affidavit from the president of the bank as to how many outstanding shares of stock there are. Your Honor, my clients tried to get discovery from all these people and it was all quashed by Judge Flannell. So you ask me how easy would it have been? A petition to reconsider setting forth this information within 30 days of the judge having made these remarks. That's my question, Counselor. My memory is I wasn't even a record at that point. Well, see, you mentioned also about how your clients were appearing pro se with this million-dollar enterprise. They couldn't afford to hire a lawyer. And if they choose to appear pro se, why should we care? Well, there were several lawyers who had appeared for it. I'm not arguing that they never hired a lawyer. I'm saying at the time these events occurred, the record shows that I appeared shortly thereafter. The record shows that they were pro se. And I don't think pro se litigants are really on top of judicial recusal. Most lawyers aren't on top of the issue of judicial recusal. Now, I don't want to be understood as arguing to this Court that the only reason this receivership order should be reversed is because Judge Flannell owns some stock in Hardware State Bank. Because it's our position that appointing a receiver is an extraordinary remedy as a matter of equity, that there were no grounds whatsoever to appoint a receiver, and whether he recuses himself or not, I think the fact that he had a relationship with this bank, de minimis or otherwise, either way, goes to the issue of whether any receiver and this receiver should have been appointed in this situation. Because he's going to be supervising this bank as the farm manager, as the person choosing this manner of farming over that manner of farming. I mean, what if the profits go down $200,000? Your time is up, Mr. Nathanson. As I mentioned earlier, you'll have an opportunity to address this again in rebuttal. Thank you. Mr. Runyon? Thank you, and may it please the Court. Counsel? My name is Craig Runyon. I'm with the Samuels Miller Law Firm in Decatur. We represent the plaintiffs' appellees, the Huggins family, who own an undivided one-half interest in approximately 640 acres of farmland. And that's the farmland that's the subject of this partition and accounting suit. Mr. Nathanson said in his argument that he wants you to start with the proposition that his client, Defendant Lyle Harrison, was managing his LLC, or was managing this farm through his LLC, by the authority of his father. And that's not the proposition that we want the Court to start with at all. We think you start with the proposition, number one, that this property is owned 50-50, that it was operated under a partnership agreement for approximately 27 years prior to the filing of this case, that for the last 10 of those years, during that 27-year time period, Hertz Farm Management Incorporated, an independent third-party farm manager, managed the farm with the agreement of all the parties, that Mr. Harrison Sr., Mr. Roger Harrison Sr., unilaterally fired that farm manager, seized control of the farm, and hired his son's company as the farm manager. That's where you start from in this case. We did not change the status quo. The Court did not change the status quo. Rather, the appellants did so by firing Hertz, and that really precipitated this whole case. When did they do that? When did they do that? I believe that Hertz Farm Management was fired at the end of 2010, and certainly no later than the first part of 2011, and that's in the amended complaint. And under the agreement that the parties had, who was to make those decisions? I believe, in all fairness, under the agreement, it was Roger Harrison Sr. That was the so-called manager under the partnership agreement. The person who really had the authority to make that decision. You're correct, Justice White. However, I think we allege in our amended complaint that he had consulted with our clients on decisions with respect to the partnership on a regular basis for a number of years prior to this case being filed. When he fired Hertz and moved forward with employing his son, all that communication ceased. As your honors know, the appointment of a receiver, or in this case a farm manager, is a highly fact-intensive inquiry. And the reason you do that is to protect and preserve the property and the income therefrom for the benefit of all those entitled. Now, Mr. Nathanson talks about how his clients have been deprived of the property and the court has seized the farm. Well, that's not the case at all. We've pled that they own half the farm. If they can prove that they own all of it through the partition proceeding, that's fine. I think that probably the court will then order that all the proceeds from the farm be paid over to them. We're not trying to take their property, and the court's not trying to do that. The court is trying to get a handle on this case from a case management perspective. And a lot of it is because one of our counts is foreign accounting. From a judicial economy standpoint, the court has to reach a stopping point at some point. If the appellants were left in control of this farm during the pendency of the case, I don't see how we could ever get a handle on where we are. And there would be no opportunity for our clients, really, to get a full accounting and determine what, if any, monies they are owed. Does your request for accounting begin at a certain point? It does. A timeline? Yes. What is that? In our amended complaint, we asked for an accounting beginning on January 1st of 2010 and going forward. I think, essentially, and hopefully, obviously, depending on the resolution of this matter, that would cut the request for an accounting off at the date the farm manager was appointed and took control and custody of the farm accounts, whatever grain was out there, etc. Counsel has made representations that some accountings have been filed. There was an accounting that was filed. In response to, there was a default order actually entered against Roger Harrison Sr. and he was the only defendant with respect to who Count 2 pertained, and that was the request for an accounting. So there was an accounting that was made. Does that go back to the date that you... It does go back to the date, but it doesn't go forward and bring it up to where we are now, I believe. Where we are now being the time, up to the time that the new farm manager... Correct. ...was appointed? Correct. And that was, it was a voluminous accounting. We have not specifically objected to it. The court has certainly not approved any of it. It has not been called for hearing yet. That's where we stand. The court took this under advisement in March of 2012? Correct. And then you filed in September an emergency motion? We did. It's kind of surprising that the court didn't act on this for those five months. Do you have any insight? Did the court explain why that was the case? Well, part of it was that after the court made the... after the court took it under advisement, they asked for us to, you know, submit potential farm managers, both sides. We did that. I think probably a month or two passed, and the court came out and asked the parties to contact Black Prairie Ag Services and Mr. Tom Wargel. It's a farm management outfit out of Clinton, Illinois. We made inquiry with Mr. Wargel, and he determined that he could not act as farm manager at this time. So that essentially sent it back to the trial court, and, you know, there was another period of time where nothing happened on that issue. And we thought with the harvest season imminent that we really wanted to get a farm manager in place with the prospect of the crop being harvested and us possibly not being able to know where that grain was going to end up or where it was going to be sold, what have you. So that's why we termed it and called it an emergency motion for a farm manager. The court did act on it, but it was kind of stop and go during that time period. During 2012 were the defendants appearing pro se? For certain periods of time, yes, they were. Mr. Nathanson is their fourth attorney in this case, and I believe that in 2012 for a period of that time Barry Hines, attorney from Springfield, represented them, but he ultimately, I can't remember if he withdrew or what, but he left the case and then Mr. Nathanson followed. At the September 12 hearing, were they pro se at that time? The hearing on the emergency motion? Yes. Yes, they were pro se at the time. I believe that three of the nine or a total of ten defendants, I believe that three of them appeared in court that day, and the hearing was held. They filed a motion to strike our emergency motion, and Judge Flannel asked questions of both sides and directly inquired of the defendants that appeared with respect to their motion and with respect to our emergency motion for the appointment of a farm manager. This was not a new issue. This was a motion that we filed back in February. It was heard in March. It was not a surprise at all to the defendants, at least from our perspective, that we were asking for this relief. Mr. Nathanson is correct when he says this is an extraordinary procedure, is he not? No, he's correct. It's the court, and while it's an extraordinary remedy, and the cases do say that, the trial court has considerable discretion in making the determination, and there's a couple factors that the cases say that you need to look at to make that determination. The primary one being whether the property or the income they're from is at risk because of, I think it's neglect, waste, misconduct, or insolvency. Well, in our admitted complaint in Count 2 that we talked about earlier, we allege various acts of misconduct. In a nutshell, we allege that Mr. Harrison Sr. seized control of the farm operation. He fired the then farm manager, appointed his son under a newly created company to manage the farm, and that they operated the farm to the exclusion of our clients without making adequate accountings or sharing the profits from the farm operation. And again, a default order was entered on that count. What's the status of that now? Well, there was a motion to vacate. The default order filed. There was a second, an amendment to the motion to vacate, the default order that was filed. Those were never called for hearing by the defendants. I believe by local rule, those motions can be considered null and void or waived after 90 days, at least by local rule. The judge hasn't actually, I don't think, explicitly done that, but they were on file and never called for hearing, essentially, Your Honor. So that's just still pending down at the trial level in some steps, whatever that may be? Whatever the status is, is what it is, yes. In addition to the various acts of misconduct we allege in our complaint, when we filed the motion for the appointment of the farm manager, we submitted bank records from the farm accounts that we had obtained via subpoena, and at that hearing, Mr. Harrison Sr., again, he was appearing pro se, he stipulated the authenticity of those bank records, which we argued to the court and certainly believe show that the farm proceeds were being misapplied, the distributions were being made to Mr. Harrison outright and for his legal defense in the case, without any like distributions being made to our clients. One of the distributions was even made in direct violation of one of the trial court's orders. Which one and what order? There was an order to not distribute any of the proceeds of the 2011 prop, I believe, without prior court approval. And I don't have the exact date of that order, but I think we argued to the court, and I believe it's clear from the records that we obtained and attached to our motion, that one of the distributions was made after the court entered an order saying, from this point on, don't make any distributions without court approval. What was the distribution, what was the amount and to whom? I believe that the amount was $20,600 and it was to Roger Harrison Sr., the defendant. And let me back up, I know that that was the largest one, but I don't want to say that that was for sure the one that violated the court order. It may have been one of the payments that were made to law firms for legal expenses. In our brief, we cited to a couple cases, People x Ralph Thainer v. Community Hospital of Evanston, that's a 1st District appellate case from 1982, and Liddell v. Smith, a 4th District case from 1963, which were both cases where the principle or principles of a corporation were managing and disposing of assets in their own interest, engaging in self-dealing and trying to cut the other party out of business. In both those cases, the appellate court upheld the trial court's appointment of a receiver, finding no abuse of discretion. So we think that there is sufficient evidence in the record to sustain the trial court's decision in this case along those same lines as the courts in the two cases cited found. And like I said, I think, furthermore, the appointment of a farm manager under the circumstances was simply smart case management by the trial court, given what's in dispute and also how this case has been marred by numerous delays. What about Mr. Nathanson's point that the hardware bank was not one of the prospective receivers suggested by anybody and that the court shouldn't have chosen it? Well, that's not true, actually. In our emergency motion, we specifically said that the hardware state bank would be a possible entity for the court to consider. It wasn't one of the original four from back in spring? Correct. It wasn't one of the original ones that we had made, but we went ahead and, in that emergency motion, submitted to the court that possibility, partly because they were the bank that held a number of the farm accounts during the period where Mr. Harrison's senior son, his LLC, was managing the farm. So they were, in a way, already involved in the case through that, but not really. How many banks are there in Sullivan? I'm not entirely sure. I think there's probably at least two or three. Actually, the hardware state bank is in Lovington, Illinois. So it's nearby, but not actually in Sullivan. Why did the farm management firm in Decatur decline to be considered for appointment? I believe that Black Prairie Ag Services declined on the basis that they were too busy to take on a farm of this size, the management of this farm. They said they didn't have the resources to do it, essentially. I don't know if it appears in the record, but I'm curious. Is it 636 acres? Approximately, yes. What, approximately, is the value of these acres, let's say, when this litigation was going on last year? I'm not aware of any recent appraisal of the farmland. I would think that based on farm sales in the area in recent years, I would say probably at least $10,000 an acre, Your Honor. It's valuable farmland, no doubt. Is that $6.5 million? $6.5 million? Give or take, probably yes. Getting back to what I was saying, one of the things that the trial court did through this order was it confines the period in dispute, and it also eliminates some of the incentive for the defendants to drag this case out any further. They stated to us in correspondence that this was going to be three- to five-year litigation. It's looking that way right now. It's looking like they were correct. By getting their hands, essentially, off the farm operation, they have less incentive to delay and to continue to try and do things like they were doing. The effect of undoing this order would really be to make it so our clients could hardly ever reach a point where they could get a full accounting to determine what monies they're owed. At this juncture, does it appear correctly that your clients say, We want a petition and an accounting. And they say, No, you don't. Even if you do, we've given you an accounting, and you should let us continue to manage this. Well, I don't… Justice Connect, I agree with the first part of that, that essentially the record as it's stated is we've stated an ownership position. They've said, No, we believe that we own 100% of the property. They say it's owned in trust, and therefore, that was their justification for not giving us profits during the period when they were managing. Why should that… When we're talking about the ownership of property, why should this take years to resolve? It shouldn't. It shouldn't at all. In the current proceedings, we have a motion for summary judgment that was just heard. And I don't know what the outcome of that will be, but we are trying to push the partition part of it at least to conclusion. Again, they've had four attorneys in this case. There have been periods where we've had months of delay to try to get a new attorney in the case. We have tried to be considerate of that fact and tried to give them continuances to get counsel because this is a highly contentious case, as you can see. Does the record show the background or experience of Ardmore State Bank in the role as farm manager? No, Your Honor. I don't believe that the record has much to say about what experience they have. I believe there may be statements by the President, Ray Duncan, that they do farm management and that they've done it in the past. Well, I understand implicit in Mr. Nathanson's argument the concern that who are these folks and they're not going to do as good a job and how do we know what kind of job they've done at all, etc. This is a big operation. What about them? Well, from our standpoint anyway, having somebody that's at least going to recognize our ownership interest and give us adequate accountings and give us the profits that we believe we're rightfully entitled to, that's going to trump whether they can save a dollar here or there or whether maybe Lyle Harrison and his farm management company can do a slightly better job managing the farm. We just want to be assured that the proceeds are being safeguarded and that we're going to have an opportunity to give what is rightfully ours. Thank you. Thank you, Counsel. Mr. Nathanson, any rebuttal, sir? Thank you, Your Honor. These accountings are in the record. I wish I could give you the precise page number. They're cited copiously in my brief. 2010-2011, we had a hearing in front of Judge Flannel a couple months ago. In 2012, Lyle Harrison brought in every check, filed an affidavit saying here's the deposits, here's what happened on the 2012 crop. Three hundred and some thousand dollars was marketed from the crop. The only thing that was paid out of that money were the Moultrie County taxes, which the judge said nothing should be paid, but somebody had to pay the taxes. Now, I want to comment on a couple points that Mr. Runyon made. First of all, the count on an accounting was sought against Roger Harrison, Sr., who, as I mentioned, is now deceased. By the way, who is his personal representative? Justice Connick, that's a great question because there is none. Well, he's not here. I got that. Counsel suggested his death of record. Months and months ago, more than 90 days under 2-1008 of the Code of Civil Procedure, I brought this up. I said you can't argue default orders about a deceased party. A deceased party is not before the court. Furthermore, there's a motion to vacate the default order, and furthermore from that, if you take a look at the default order, it says it reserves all issues. It is not a default judgment. The judge defaulted him for not answering within a couple weeks of the answer due date and said I reserve all issues of title, accounting, and everything else. So what that order really is is a great question. But I agree with you, Justice Connick, that Roger Harrison, Sr. is not a party to this case, a dead person. I mean no disrespect to his family who are sitting behind me. A dead person cannot be a party to the case. That's obvious. And the plaintiffs whose job it is having sued him and having suggested his death of record to substitute a personal representative have not done so to date. I don't think they should be. Except you filed a brief on his behalf. He's a named party. I mean I don't know who ought to be correcting him. What should we do? What should we do regarding? I think that's easy. What you should do, the default order is a canard. It's got nothing to do with anything. But that's not before us in this appeal. Well, they've raised this issue of accounting. They've said we need a receiver because we're not getting accountings. So it's sort of dovetailed into a receiver issue. Respectfully, the accountings are in the record. There's no basis to appoint a receiver based on the absence of any accounting. Now, I think the most important sentence in this appeal is on page 12 of the brief filed by the plaintiffs. And I quote, Plaintiffs are better off having a farm manager that will protect their interests in the net proceeds from the farm operation. That is the plaintiff's position. The problem is that's not the standard for appointing a receiver. I'm sure they're better off. But that's not legally and equitably what should have been considered whatsoever. I'm told the value of the farm justice stipend is $9 million. So somewhere between 6 and 9 is the answer to your question. Thank you for that. I'd just like to make one more point, if the court would permit me. Sure. It is not an act of misconduct to pay a lawyer fees when you're entitled to half the money. That's the only argument they have in support of a receiver. That Mr. Harrison Sr., when he was alive, paid lawyers out of his portion of the money. The date of the order you asked Mr. Runyon about was November 15th of 2011. When they filed a motion to get half the proceeds of the farm distributed to them, Judge Flannel decided sua spati to freeze everything. Their motion didn't even ask to freeze Mr. Harrison's portion of the money, but he froze everything. So Mr. Harrison was accused of violating that order later by paying legal fees. Now, last point. Directors and officers. They're relying on case law that directors and officers who take money belonging to a corporation justify the appointment of a receiver. Mr. Harrison wasn't a director or officer of a corporation. The director or officer doesn't own the corporation. Half the assets don't belong to the director or officer. Mr. Harrison was someone who counsel conceded had been managing this farm for 27 years who then appointed his son to be the manager. I agree with Justice White's comment that the point that Justice White made was that Mr. Harrison Sr. had, under the partnership agreement that had previously existed, which was terminated by Mr. Runyon's client, under that partnership agreement Mr. Harrison Sr. had been the managing general partner. So it wasn't alteration. He didn't seize anything by appointing Lyle. He had been managing the farm all along. So it was an alteration of the status quo to dispossess the Harrisons and put Hardware State Bank in charge. So did he alter the status quo by firing the previous farm manager? I don't think so, Justice Kinnick, because he had the authority as the managing general partner to have Hertz Farm Management or Lyle, Harrison's company, Harrison Farm Management LLC, or someone else. Our brief, we have documented why Hertz was let go and why Lyle took over. Hertz filed an accounting for 2010. That's in the record. Lyle has accounted for everything since then. The farm has been more profitable under Lyle's management, which counsel basically concedes, but says that's not sufficient. We ask you to reverse the appointment of a receiver. I thank the court for the court's decision. Thank you, counsel. We'll take this matter under advice.